IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF VANESSA V. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF VANESSA V. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CHELSEA J., APPELLANT.

Filed November 22, 2022.    No. A-22-273.

Appeal from the Separate Juvenile Court of Douglas County: MARY M.Z. STEVENS, Judge. Affirmed.

Kenneth Jacobs, of Hug & Jacobs, L.L.C., for appellant.

Shinelle Pattavina, Deputy Douglas County Attorney, for appellee.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Chelsea J. appeals from an order of the separate juvenile court of Douglas County terminating her parental rights to her five children. Upon our de novo review, we affirm the juvenile court's order.

## BACKGROUND

Chelsea is the mother of Vanessa V., born September 2009; Raeland D., born August 2015; Dvoys D., born March 2017; Ryland D., born March 2018; and Meiland D., born January 2019.

On or about October 19, 2017, the State filed an amended petition alleging Vanessa, Raeland, and Dvoys were minor children under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), due to the lack of proper parental care through the faults and habits of Chelsea. The amended

- 1 -

petition further alleged: (A) Chelsea was homeless; (B) Chelsea had failed to provide for the daily needs of the children; (C) Chelsea had failed to place herself in a position to parent the children; (D) Chelsea had failed to provide proper parental care, support, and supervision for the children; and (E) due to the above allegations, the children were at risk of harm. The three children were subsequently removed from Chelsea's care and placed in the temporary custody of the Nebraska Department of Health and Human Services (DHHS). On December 11, the court entered an adjudication order, finding Vanessa, Raeland, and Dvoys were within the meaning of § 43-247(3)(a).

On March 7, 2018, the State filed a second supplemental petition in regard to Ryland. The petition alleged Ryland was a minor child under § 43-247(3)(a), due to the lack of proper parental care through the faults and habits of Chelsea. The second supplemental petition further alleged: (A) Chelsea had two open juvenile cases in which she had failed to reunify with said juveniles; (B) Chelsea's use of alcohol and/or controlled substances placed Ryland at risk for harm; (C) Chelsea had failed to provide proper parental care, support, and supervision for Ryland; (D) Chelsea had failed to provide Ryland with safe, stable housing; and (E) due to the above allegations, Ryland was at risk for harm. Ryland was removed from Chelsea's care and placed in the temporary custody of DHHS. On April 5, the court entered an adjudication order, finding Ryland was a child within the meaning of § 43-247(3)(a).

The first dispositional order was entered May 11, 2018. The dispositional order, in relevant part, required Chelsea to obtain safe and stable housing, obtain a legal source of income, and participate in supervised visitation. Subsequent court orders required Chelsea to maintain safe and stable housing, maintain a legal source of income, participate in visitation, follow parenting redirection and instruction during visits, and meet with the children's physician to better provide healthy nutrition to the children.

On April 21, 2020, the State filed a fifth supplemental petition in regard to Meiland. The petition alleged Meiland was a minor child under § 43-247(3)(a), due to the lack of proper parental care through the faults and habits of Chelsea. The fifth supplemental petition specifically alleged: (A) Chelsea had two open juvenile court cases involving her minor children; (B) under the two juvenile court dockets, Chelsea had failed to comply with court orders, resulting in her minor children remaining in out-of-home care since October 2017; (C) it had been reported that Chelsea gave birth to Meiland in January 2019 and did not let her case manager know; (D) Chelsea had refused to participate in a Child Protective Services investigation involving Meiland; (E) Chelsea had failed to provide Meiland with proper parental care, support, supervision, and/or protection; (F) Chelsea had failed to provide Meiland with safe, stable housing; and (G) for the above reasons, Meiland is at risk for harm. Meiland was removed from Chelsea's care and placed in the temporary custody of DHHS. The court entered an adjudication order on September 29, 2020, finding that Meiland was a child within the meaning of § 43-247(3)(a).

On August 25, 2021, the State filed a fourth motion for termination of Chelsea's parental rights to all five of the children. The motion alleged that Vanessa, Raeland, Dvoys, Ryland, and Meiland were all juveniles within the meaning of Neb. Rev. Stat. § 43-292(2) (Reissue 2016) because Chelsea had substantially and continuously or repeatedly neglected and refused to give necessary parental care and protection; Vanessa, Raeland, Dvoys, Ryland, and Meiland were all juveniles within the meaning of § 43-292(6) because reasonable efforts to preserve and reunify the

family had failed to correct the conditions that led to removal; and Vanessa, Raeland, Dvoys, Ryland, and Meiland were all juveniles within the meaning of § 43-292(7) because they had been out of the home for more than 15 of the most recent 22 months. The fourth motion for termination of parental rights also alleged that it was in the best interest of the children to terminate Chelsea's parental rights.

Trial on the fourth motion for termination of parental rights was heard on multiple days in January and March 2022. The State called multiple witnesses, including case managers, visitation and family support workers, foster parents, and Vanessa's therapist.

Joaquin Guerrero supervised visitation between Chelsea and her children from January to June 2021. Guerrero testified that visits typically occurred in Chelsea's home. Guerrero recalled that some of the visits were chaotic, the children would not listen to Chelsea, and she seemed overwhelmed at times. On one occasion, Chelsea asked to end a visit early because she was unable to control the children. Guerrero testified that Chelsea was loving and playful with the children but lacked follow through with enforcing rules.

Megan Cooper was the family's case manager from January 2020 until March 2021. Cooper testified this juvenile case began after Chelsea was arrested for shoplifting and left the children with Roland D., the biological father of Raeland, Dvoys, Ryland, and Meiland. Roland had open juvenile dockets at the time so it was considered unsafe to leave the children with him. Cooper testified that she learned Roland had physically and mentally abused Chelsea on multiple occasions, resulting in Chelsea not having safe, stable housing, as she lived with Roland. Due to the physical and mental abuse, Chelsea had left the home on numerous occasions but always came back. Cooper estimated Chelsea had left the home she shared with Roland and then went back to the home on seven different occasions within an approximate 3-month period. Cooper testified that when she left the case in March 2021, Chelsea was living with Roland.

Cooper also testified that she tried to help Chelsea obtain safe housing, which had been ordered by the court. Cooper got Chelsea into a homeless shelter four times, but Chelsea only showed up to the shelter on two occasions, and the longest she stayed was 3 days. At one point, Chelsea told Cooper she was living in a van, and another time told her she was living at a hotel with her sister who had previously been involved in the juvenile court system. Chelsea always eventually went back to live with Roland.

In regard to visits, Cooper testified that Chelsea's visits with all five children were chaotic and she did not attend to the children. There were concerns about the children overeating or eating only unhealthy foods, there was little interaction between Chelsea and the children, and Vanessa and another older child of Chelsea's would be doing the parenting. The visitation workers also reported issues with Chelsea not following instructions or redirection that they gave her. Cooper testified that she had multiple conversations with Chelsea about not meeting the children's needs or properly supervising them, but there was no change.

Cooper also testified about Chelsea's inability to maintain a stable income despite Cooper's attempts to help her. Cooper testified that Chelsea was repeatedly fired from jobs, quit them, or refused offers of employment.

Cooper also testified that when she took over as case manager there was suspicion that Chelsea had been pregnant the year before and went to Council Bluffs to have the baby to prevent DHHS from finding out. When Cooper asked Chelsea if she had another child, she denied it.

Cooper testified that she did two walk-throughs of Chelsea's home between January and May 2020 and there was nothing in the home to suggest another child lived there. Meiland was ultimately discovered and removed from Chelsea's home when he was 14 months old.

Cooper testified it was in the children's best interest to terminate Chelsea's parental rights because of her noncompliance with court orders, lack of consistency in being able to provide for the children's needs, lack of full participation in visits, and the continued turmoil in her relationship with Roland.

Christine Watson provided family support services to Chelsea beginning in September 2020 and was still doing so at the time of trial. Watson testified that Chelsea had failed to make any substantial progress in achieving safe and stable housing, in accordance with the court's orders. Chelsea was continually leaving the home she shared with Roland and coming back, refusing to stay in shelters, and unable to obtain other housing alternatives due to nonpayment of previous rent and an eviction.

Watson also testified that Chelsea refused to stay away from Roland despite the physical abuse, as well as regular verbal altercations. Watson testified that Roland was in jail at the time of her testimony for a domestic abuse incident that occurred in January 2022. As a result of the incident, Chelsea had facial injuries and a wound on her leg. Chelsea told the responding police officer that Roland had struck her with his hands and threw a vacuum at her. The police officer indicated he had previously responded to another incident at Chelsea and Roland's residence.

Watson testified that Chelsea continued to have contact with Roland while he was incarcerated after the January 2022 incident. Watson testified that she has had numerous conversations with Chelsea about the domestic violence by Roland and until Chelsea separates herself from Roland she is not going to make progress in obtaining safe, stable housing.

Watson also testified about Chelsea's lack of stable income. Chelsea was fired from jobs because of her failure to arrive at work on time. At the time of Watson's testimony in January 2022, Chelsea had not been employed since November 2021. Watson did not believe Chelsea had made any progress in obtaining and maintaining a stable income.

Nicole Halbfass was the foster mother of the four youngest children and previously of all five children. Halbfass testified about the children's extreme and abnormal behaviors after visits with Chelsea. She testified that the children were defiant and aggressive for several days after a visit. They would also urinate or defecate on themselves, despite being toilet trained. At the time of Halbfass' testimony, Chelsea had not had a visit for the past month. Halbfass testified that since visits had stopped, the children's behavior had improved. She also testified that there was a 90-day period in 2021 that Chelsea did not have visits and the children were not exhibiting the negative behaviors during that time, but once visits resumed, the behavior also resumed.

Halbfass also testified that Chelsea had missed approximately 15 visits, and only attended a few medical appointments for the children.

Cheryl Seals, Vanessa's foster mother since May 2021, testified that Vanessa had been diagnosed with post-traumatic stress disorder, attention deficit hyperactivity disorder, and a sleeping disorder. Due to Vanessa's diagnoses, Vanessa regularly attended therapeutic sessions and medical appointments as frequently as once a week. Seals testified Chelsea did not attend any of Vanessa's psychiatric or therapeutic sessions, or any other medical appointments.

Kaitlyn Harper became Vanessa's therapist in the fall of 2018 and she continued treating her until September 2020. Vanessa was referred to Harper because of her defiant behavior at home and in school. Harper testified that Vanessa required extensive therapy, both day inpatient and outpatient services. Harper testified that Vanessa's behavioral issues increased after contact with Chelsea, indicative of inconsistencies in her home environment and/or authority figures. Harper further testified Vanessa must have structure, stability, and permanency in her life for her to progress. She stated that lack of consistency would cause concern for additional mental health disorders.

Cherish Harbour was the case manager for Chelsea starting in July 2021 and continuing until trial. Harbour testified about Chelsea's lack of compliance with court orders. She testified that Chelsea had not achieved the goal of maintaining safe, stable housing because she had been living with Roland, who was physically, verbally, and mentally abusive. In addition, at the time of Harbour's testimony, Chelsea was homeless. Chelsea had been evicted from her home in March 2022 and reported to Harbour that she was staying with friends at various locations. Harbour testified that during her time assigned to the case she has tried to help Chelsea obtain safe housing, to no avail. Harbour also assisted Chelsea in trying to obtain a restraining order against Roland, but Chelsea failed to appear in court. Even after Roland physically abused Chelsea in January 2022 and was in jail as a result, Chelsea was accepting calls from him.

Harbour testified that Chelsea failed to maintain a legal source of income because she had jumped from job to job during the time Harbour had been the case manager. Chelsea regularly failed to go to work on time and had an inability to stay employed anywhere for longer than a month. Harbour testified that because Chelsea was unable to get herself to work on time she did not believe Chelsea would be able to care for five children and get them to school and anywhere else they needed to be.

Harbour also testified that Chelsea failed to have regular visitation with her children. Chelsea did not have visits during the week she was in jail in January 2022, followed by a month of missed visits because she told the visitation worker she had COVID, but never provided either a positive or negative COVID test. Chelsea was discharged from two visitation companies during the time Harbour has been the case manager due to missing visits with her children. Chelsea told Harbour visits were missed because she did not have transportation, but Harbour testified that she has given Chelsea bus passes. Other visits were canceled because Chelsea was late. Chelsea's visits were suspended by the court for 90 days in 2021 because of the extreme behavior of the children at visits and Chelsea's inability to control them. Harbour recommended that visits continue to be supervised because Chelsea continued to feed the children unhealthy food and the visits continued to be chaotic.

Harbour also testified to other concerns regarding Chelsea. Harbour stated Chelsea was arrested in January 2022 for possession of methamphetamine. She had been a passenger in a vehicle and during a traffic stop of the vehicle Chelsea was found to be in possession of 5 grams of methamphetamine and a marijuana pipe. She claimed that she was holding the drugs for one of the other individuals in the vehicle. Chelsea admitted to the arresting officer that she had used methamphetamine within the last few days, which would have been during the course of the termination trial. Chelsea also missed her court date for the possession charge and as a result, there was an outstanding warrant for her arrest at the time of trial.

Ultimately, Harbour concluded it would be in the best interests of the children to terminate Chelsea's parental rights. Harbour testified Chelsea's rights should be terminated because she has failed to provide stable housing, a stable income, and a safe environment. She further testified that Chelsea has had nearly 53 months to comply with the court orders and failed to do so.

Following trial, the court entered an order on March 21, 2022, terminating Chelsea's parental rights to her five children. The court found that the minor children were within the meaning of § 43-292(2), (6), and (7) by clear and convincing evidence, and that it was in their best interests to terminate Chelsea's parental rights. The court also denied a motion that Chelsea had filed to continue to allow her visitation with the children in the event her rights were terminated and until such time as the children were adopted and/or pending appeal.

## ASSIGNMENTS OF ERROR

Chelsea assigns that the juvenile court erred in (1) finding that the State proved by clear and convincing evidence that statutory grounds existed to terminate her rights based on § 43-292(2), (6), and (7); (2) finding that the State proved by clear and convincing evidence that termination was in the children's best interests; and (3) denying her motion for continued contact with the children.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

*Statutory Grounds for Termination.*

Chelsea assigns that the juvenile court erred in finding that the State proved by clear and convincing evidence that statutory grounds existed to terminate her parental rights under § 43-292(2), (6), and (7). For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019), *review denied* (Sept. 26, 2019). The State must prove these facts by clear and convincing evidence. *Id.*

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 43-292(2), (6), and (7). Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al., supra.* In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Becka P. et al., supra.*

In the present case it is undisputed that the children have been in out-of-home placement for 15 or more months of the most recent 22 months. Vanessa, Raeland, and Dvoys were removed

from Chelsea's home in October 2017. Ryland was removed in March 2018, and Meiland was removed in April 2020. None of the children have returned home since removal. The State filed its fourth motion for termination of parental rights on August 25, 2021, and the termination trial concluded on March 17, 2022. By the last day of trial, Vanessa, Raeland, and Dvoys had been out of the home for approximately 53 months, Ryland had been out of the home for approximately 49 months, and Meiland had been out of the home for approximately 23 months. Therefore, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al., supra.* Because we conclude that the State presented clear and convincing evidence that grounds to terminate existed under § 43-292(7), we need not address the other statutory grounds.

*Best Interests.*

Chelsea next assigns that the juvenile court erred in finding that the State proved by clear and convincing evidence that it was in the children's best interests to terminate her parental rights.

Under § 43-292, in addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests' analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019), *review denied* (Sept. 26, 2019). The evidence adduced to prove termination on any statutory ground other than § 43-292(7) is highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. See *In re Interest of Shelby L.*, 270 Neb. 150, 699 N.W.2d 392 (2005).

The first three children were removed in October 2017, well over 4 years before the termination trial began. Despite the years Chelsea has had to rehabilitate herself, she had failed to

do so. Throughout this case, the main court ordered requirements for Chelsea to obtain reunification have remained the same and she has failed to achieve them.

First, Chelsea has failed to obtain and maintain safe and stable housing. Since the case began, she was living with Roland, who was physically and verbally abusing her. She has moved out on numerous occasions, but always comes back to the home she shares with him. Even after he was arrested in January 2022 for assaulting her, the same month the termination trial started, Chelsea continued to have contact with him. Her case managers and family support workers have repeatedly talked to her about the domestic abuse and the need to distance herself from Roland. Harbour also helped her try to obtain a restraining order against Roland, but Chelsea did not show up for the court date.

Chelsea's case managers and family support workers have also tried to help her obtain different housing. Cooper testified that she got Chelsea into a homeless shelter four times, but she only showed up twice. She also did not stay in a shelter for more than 3 days. By the end of the termination trial, Chelsea had been evicted from her residence and was homeless.

Chelsea had also failed to maintain a legal source of income. She has not had a stable job throughout this case. She has obtained multiple jobs but she either quits after a short time or she is fired for being late. At the time of trial, she had not been employed at all since November 2021.

Chelsea was also ordered to have supervised visitation with the children. Although supervised visitation has occurred, it has not always been consistent and has not always gone well. Chelsea's visits were suspended by the court for 90 days in 2021 because of the extreme behavior of the children at visits and Chelsea's inability to control them. Chelsea was discharged from two visitation companies due to missing visits with her children. Chelsea told Harbour visits were missed because she did not have transportation, but Harbour testified that she has given Chelsea bus passes. Other visits were canceled because Chelsea was late. Chelsea did not have visits during the week she was in jail in January 2022, followed by a month of missed visits because she told the visitation worker she had COVID, but never provided either a positive or negative COVID test.

The visits have been described as chaotic. The children will not listen to Chelsea and she is unable to control them. There have also been ongoing concerns about Chelsea allowing the children to overeat and only providing unhealthy food. Chelsea also would not follow instructions or redirection by the visitation worker. Harbour recommended that visits continue to be supervised because Chelsea continued to feed the children unhealthy food and the visits continued to be chaotic.

The children's behavior is also negatively affected by visitation with Chelsea. One of the foster parents testified that the children are defiant and aggressive for several days after visits. They will also urinate and defecate on themselves, despite being toilet trained. During the periods of time where there have been no visits, the children's behavior has improved and they do not exhibit the same behavior they do after visits. Harper, Vanessa's past therapist, also testified that Vanessa's behavioral issues increase after contact with Chelsea.

Cooper and Harbour both testified it was in the children's best interest to terminate Chelsea's parental rights. Cooper's opinion was based on Chelsea's noncompliance with court orders, lack of consistency in being able to provide for the children's needs, lack of full participation in visits, and the continued turmoil in her relationship with Roland. Harbour testified

Chelsea's rights should be terminated because she has failed to provide stable housing, a stable income, and a safe environment. Harbour also noted the amount of time that Chelsea has had to comply with the court orders and still failed to do so.

We find there was clear and convincing evidence to show that Chelsea was unfit and that terminating her parental rights was in the children's best interests.

*Continued Visitation.*

Finally, Chelsea assigns that the juvenile court erred in denying her motion for continued contact with the children. Chelsea had filed a motion to continue to allow her visitation with the children in the event her rights were terminated and until such time as the children were adopted and/or pending appeal. The court denied the motion.

This court has held that the juvenile court retains jurisdiction to award continued contact to a parent whose parental rights have been terminated, while recognizing that once parental rights are terminated, a parent has no standing to assert entitlement to continued visitation. See *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684 N.W.2d 594 (2004). The Nebraska Supreme Court has upheld prior denials of continued visitation after termination of parental rights in cases where such continued visitation was found to not be in the best interests of the children. See, *In re Interest of J.H. et al.*, 233 Neb. 338, 445 N.W.2d 599 (1989); *In re Interest of Z.D.D. and N.J.D.*, 230 Neb. 236, 430 N.W.2d 552 (1988).

As previously discussed, the evidence showed that the children displayed negative behaviors for several days after visits with Chelsea. These behaviors do not occur when there is a lapse in visitation. Based on the evidence of the children's behavior after visits, we cannot say that the juvenile court erred in denying Chelsea's motion to continue visitation.

CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Chelsea's parental rights existed under § 43-292(7) and that termination of her parental rights was in the children's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.